**\*\*\* FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-16-0000071
03-MAR-2022
08:48 AM
Dkt. 219 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

HEALOHA CARMICHAEL, LEZLEY JACINTHO,
and NĀ MOKU AUPUNI O KOʻOLAU HUI,
Petitioners/Plaintiffs-Appellees/Cross-Appellees/
Cross-Appellants,

vs.

BOARD OF LAND AND NATURAL RESOURCES, SUZANNE CASE,
in her official capacity as Chairperson of the Board of Land and
Natural Resources, the DEPARTMENT OF LAND AND NATURAL RESOURCES,
Respondents/Defendants-Appellees/Cross-Appellees/
Cross-Appellants,

and

ALEXANDER & BALDWIN, INC., EAST MAUI IRRIGATION CO., LTD.,
and HAWAIIAN COMMERCIAL AND SUGAR CO.,
Respondents/Defendants-Appellants/Cross-Appellees,

and

COUNTY OF MAUI, DEPARTMENT OF WATER SUPPLY,
Respondent/Defendant-Appellee/Cross-Appellant/Cross-Appellee.

_____

SCWC-16-0000071

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000071; 1CC151000650)

MARCH 3, 2022

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ.[1]

OPINION OF THE COURT BY WILSON, J.

Since 1986, the water rights for 33,000 acres of ceded lands in the Koʻolau Forest Reserve and Hanawi Natural Area Reserve have been governed by four revocable permits issued by Respondent/Defendant-Appellant/Cross-Appellee/Cross-Appellant the Board of Land and Natural Resources ("BLNR") to for-profit corporate entities, Respondents/Defendants-Appellants/Cross-Appellees Alexander & Baldwin, Inc. ("A&B") and East Maui Irrigation Co., Ltd. ("EMI"). In this case, we consider whether BLNR's authorization of these four permits during the past decade to divert more than 100 million gallons of water per day from east Maui streams required an environmental assessment ("EA") pursuant to the Hawaiʻi Environmental Policy Act ("HEPA"), Hawaiʻi Revised Statutes ("HRS") chapter 343.

Given the significant environmental impact of the permitted action, the BLNR's authority to issue revocable permits is subject to the environmental review requirements of HEPA. The Intermediate Court of Appeals' ("ICA") July 31, 2019 judgment on appeal pursuant to its June 18, 2019 memorandum opinion is therefore vacated, and this case is remanded to the

_____

[1] Associate Justice Richard W. Pollack, who was a member of the court when the oral argument was held, retired from the bench on June 30, 2020.

Circuit Court of the First Circuit ("circuit court") for proceedings consistent with this opinion.

## I. BACKGROUND

### A. 2000 Issuance of Revocable Water Permits

In 1985, the BLNR approved the public-auction sale of a thirty-year water license that would have consolidated four license areas—the Honomanū license area, the Huelo license area, the Keʻanae license area, and the Nāhiku license area (collectively, the "license areas")—spanning approximately 33,000 acres of ceded lands in the Koʻolau Forest Reserve and Hanawi Natural Area Reserve under a single license.[2]  However, issuance of the thirty-year license was suspended at the request of the Department of the Attorney General pending the settlement of a separate water case.  Water rights for the license areas came to be governed thereafter by annual revocable water permits issued for each fiscal year.

---

[2]    The four license areas are "affected and partly governed by" the East Maui Water Agreement made in 1939 between the then—Territory of Hawaiʻi and EMI.  That Agreement provided for "the joint use by the Territory and EMI of the aqueduct system" and "enabled the State to dispose of the water licenses at a public auction instead of restricting the sale only to EMI." The aqueduct system runs through lands belonging to the government and to EMI.

On May 26, 2000, the BLNR approved the issuance of four annual revocable water permits to A&B and EMI,[3] effective July 1, 2000 and expiring on June 30, 2001.  Each of the permits—S-7263 (Honomanū), S-7264 (Huelo), S-7265 (Ke'anae), and S-7266 (Nāhiku) (collectively, the "revocable permits")—gave the permittee[4] the "[r]ight, privilege, and authority for the development, diversion, and use of water" from the relevant license area, "pursuant to the terms and conditions" in the relevant expired general leases.  These permits authorized EMI to divert more than 100 million gallons of water per day from east Maui streams for sugar-cane irrigation by Hawaiian Commercial and Sugar Co. ("HC&S"), another subsidiary of A&B, in central Maui.  The permits also authorized the delivery of approximately 8.6 million gallons of water per day from east Maui streams to Maui County water treatment facilities that provided the majority of water to a population of approximately 35,000 people in upcountry Maui.  Each of the revocable permits

---

[3]    A&B is a for-profit corporation that was engaged at all relevant times primarily in real estate development in Hawai'i and sugar cultivation in central Maui, and EMI is a subsidiary of A&B.

[4]    For the 2000-01 fiscal year permits, A&B was the permittee for the Honomanū, Huelo, and Ke'anae license areas and EMI was the permittee for the Nāhiku license area.

4

stated that they were issued pursuant to HRS § 171-58 (1993).[5]

The BLNR added, as a condition to the issuance of the revocable

permits, that the Department of the Attorney General issue an

opinion regarding compliance with HEPA as it related to these

leases.[6]

## B. 2001 Long-Term Lease Application and Continuance of Revocable Permits

On May 14, 2001, A&B and EMI filed an application

requesting that the BLNR (1) consolidate the four license areas

---

[5]     HRS 171-58(c) (2011) provides:

Disposition of water rights may be made by lease at public
auction as provided in this chapter or by permit for
temporary use on a month-to-month basis under those
conditions which will best serve the interests of the State
and subject to a maximum term of one year and other
restrictions under the law; provided that any disposition
by lease shall be subject to disapproval by the legislature
by two-thirds vote of either the senate or the house of
representatives or by majority vote of both in any regular
or special session next following the date of disposition;
provided further that after a certain land or water use has
been authorized by the board subsequent to public hearings
and conservation district use application and environmental
impact statement approvals, water used in nonpolluting
ways, for nonconsumptive purposes because it is returned to
the same stream or other body of water from which it was
drawn, essentially not affecting the volume and quality of
water or biota in the stream or other body of water, may
also be leased by the board with the prior approval of the
governor and the prior authorization of the legislature by
concurrent resolution.

The text of the statute has remained unchanged since the
BLNR first issued the revocable permits in 2000.

[6]     Petitioners allege this fact in their first amended complaint,
and the State and A&B Defendants admit so in their answers.  A May 25, 2001
report from the Department of Land and Natural Resources ("DLNR") stated
that, as of the BLNR's May 26, 2000 meeting, "[t]he Attorney General ha[d]
been reviewing the issues and w[ould] report on that review to the [BLNR]."
There is no evidence in the record that such an opinion was ever issued by
the Department of the Attorney General.

under one thirty-year lease and sell the lease at public auction and (2) authorize "temporary continuation" of the four revocable permits pending issuance of the long-term lease ("proposed long-term lease"). On May 23, 2001, Petitioner/Plaintiff-Appellee/Cross-Appellee/Cross-Appellant Nā Moku Aupuni O Koʻolau Hui ("Nā Moku"), a Native Hawaiian non-profit organization, along with three Native Hawaiian individuals, petitioned the BLNR, pursuant to HRS chapter 91, for a contested case hearing on the proposed long-term lease for the license areas. The contested case proceedings—which concerned the same activity as, but do not form the basis for, this appeal—continued for nearly six years. Those proceedings included an appeal to and remand from the circuit court, as well as the publication of several orders containing findings of fact and conclusions of law by the BLNR.

### 1. 2001 "Holdover" of Revocable Permits

At a May 25, 2001 meeting, the BLNR considered an agenda item titled "Discussion on Long-term Dispositions of Water Licenses and Issuance of Interim Revocable Permits to [A&B] and [EMI] for the [License Areas.]" The administrator of the Land Division of the DLNR recommended that the BLNR authorize the issuance of interim revocable permits to EMI and A&B, and "explained that the long-term disposition process [was] subject to discussion, that there [was] going to be a [HEPA]

requirement, and that the applicant [would] be required to prepare the necessary environmental documents." An A&B representative requested that the BLNR also approve the proposed long-term lease it had requested in its May 14 letter to the BLNR. However, a Deputy Attorney General "clarified that the only matter before the [BLNR] for action [was] the issuance of the 4 interim revocable permits" and that the proposed long-term lease was "listed on the agenda for discussion only and [could not] be acted on by the Board at [that] time." A Nā Moku representative testified that they would be petitioning for a contested case hearing. The BLNR voted to defer action and instead "grant a holdover permit on a month-to-month basis [to EMI and A&B], pending the results of the contested case hearing" ("2001 holdover decision").

**2. 2002 "Holdover" of Revocable Permits and Subsequent "Continuation" or "Renewal"**

Nearly a year later, at the BLNR's February 22, 2002 meeting, the BLNR indicated that it would review the rental rates for the revocable permits. At the BLNR's May 24, 2002 meeting, upon consideration of an agenda item titled "Re-issuance of Interim Revocable Permits to [A&B] and [EMI] for the [License Areas]" BLNR staff recommended that the BLNR "authorize the re-issuance of permits for the subject waters in the interim and pending the outcome of the contested case." The BLNR Chair stated that the BLNR's intention was "to keep the

status quo and that [the revocable permits] w[ere] brought back to the Board because of questions raised about authority to holdover permits beyond a year." The BLNR again voted to "defer and grant a holdover of the existing revocable permit on a month-to-month basis pending the results of the contest [sic] case hearing" ("2002 holdover decision").[7]

After the BLNR's 2002 holdover decision, the revocable permits were annually "continued" by a process in which the BLNR reviewed and voted to approve for continuation a "master listing" of hundreds of revocable permits submitted by the DLNR.[8] This process continued the revocable permits included on the master listing on a month-to-month basis for a one-year period. The DLNR's submissions to the BLNR from 2002 to 2004 cite HRS § 171-55 (1993) as its authority for this annual review process.[9]

_____

[7]    Documentation from the BLNR indicates that because the revocable permits were continued on a "holdover" basis, they did not appear on the December 2002 master listing.

[8]    The revocable permits were not subject to this annual review and continuation process in 2003 or 2004 and first appeared on the master listing submitted to the BLNR on November 18, 2005. In a declaration, the administrator of the Land Division of the DLNR stated that he put the revocable permits on the 2005 master listing "to be consistent with how all of the other revocable permits were being addressed by DLNR."

[9]    HRS § 171-55 (2011) provides:

> Notwithstanding any other law to the contrary, the board of land and natural resources may issue permits for the temporary occupancy of state lands or an interest therein on a month-to-month basis by direct negotiation without public auction, under conditions and rent which will serve the best interests of the State, subject, however, to those restrictions as may from time to time be expressly imposed by the board. A permit on a month-to-month basis may

(continued . . . )

8

The revocable permits issued to A&B and EMI appeared on the master listings dated November 18, 2005; October 27, 2006; November 16, 2007; October 24, 2008; October 23, 2009; November 12, 2010; January 13, 2012; December 14, 2012; January 10, 2014; and December 12, 2014.[10]

## C.    Circuit Court Proceedings[11]

In response to the BLNR's December 12, 2014 decision approving the continuation of the revocable permits ("2014 continuation decision"), on April 10, 2015, Petitioners/ Plaintiffs-Appellees/Cross-Appellees/Cross-Appellants Healoha Carmichael, Lezley Jacintho, and Nā Moku (collectively, "Petitioners") filed a complaint for declaratory and injunctive relief against the BLNR, its interim chair, Carty Chang,[12] and the DLNR (collectively, "the State Defendants"); A&B, EMI, and

---

(. . . continued)

> continue for a period not to exceed one year from the date of its issuance; provided that the board may allow the permit to continue on a month-to-month basis for additional one year periods.

The text of the statute has remained unchanged since the DLNR first invoked it in 2002.

[10]    At its December 12, 2014 meeting, consistent with the DLNR's recommendation, the BLNR again approved the continuation of the revocable permits included in the master listing.  The DLNR notified A&B and EMI in letters dated December 29, 2014 that the revocable permits were continued "on a month-to-month basis for an additional year up to December 31, 2015."

[11]    The Honorable Rhonda A. Nishimura presided.

[12]    Current BLNR Chair Suzanne Case was later substituted as a defendant for Carty Chang.  See Hawai'i Rules of Civil Procedure Rule 25(d)(1) (2001).

HC&S (collectively, "the A&B Defendants"); and the Maui County

Department of Water Supply ("the County") in the circuit court.[13]

Petitioners alleged in their amended complaint that, under HRS

§ 343-5 (Supp. 2012),[14] the "renewal of [the A&B Defendants']

---

[13]    Petitioners' amended complaint stated that the County was "only named as an interested party," but in its answer, the County denied that it was only an interested party and argued that "[Petitioners]' prayed [sic] for relief could have serious and widespread consequences on Defendant County and its citizens, and therefore, Defendant County has a heavy interest in the outcome of these proceedings."

[14]    HRS § 343-5 provides, in relevant part:

(a)  Except as otherwise provided, an environmental assessment shall be required for actions that:

(1)  Propose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects that the agency has not approved, adopted or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies; provided further that an environmental assessment for proposed uses under section 205-2(d)(11) or 205-4.5(a)(13) shall only be required pursuant to section 205-5(b);

. . . .

(c)  For environmental assessment for which a finding of no significant impact is anticipated:

(1)  A draft environmental assessment shall be made available for public review and comment for a period of thirty days;
(2)  The office shall inform the public of the availability of the draft environmental assessment for public review and comment pursuant to section 343-3;

(3)  The agency shall respond in writing to comments received during the review and prepare a final environmental assessment to determine whether an environmental impact statement shall be required;

(continued . . . )

10

revocable permit[s]" constituted applicant action proposing the use of State land and, as such, required the preparation of an EA pursuant to HEPA. Thus, Petitioners contended that HEPA was violated (1) when the BLNR failed to order an EA before its 2014 continuation decision, and (2) when A&B and EMI continued to divert water without preparing an EA.[15] Petitioners asked the circuit court to declare that HEPA had been violated, void the revocable permits, order the completion of an EA, and enjoin further diversion of water from the license areas, provided that

---

(. . . continued)

> (4) A statement shall be required if the agency finds that the proposed action may have a significant effect on the environment; and
>
> (5) The agency shall file notice of the determination of the office. When a conflict of interest may exist because the proposing agency and the agency making the determination are the same, the office may review the agency's determination, consult the agency, and advise the agency of potential conflicts, to comply with this section. The office shall publish the final determination for the public's information pursuant to section 343-3.

> The draft and final statements, if required, shall be prepared by the agency and submitted to the office. The draft statement shall be made available for public review and comment through the office for a period of forty-five days. The office shall inform the public of the availability of the draft statement for public review and comment pursuant to section 343-3. The agency shall respond in writing to comments received during the review and prepare a final statement.

> The office, when requested by the agency, may make a recommendation as to the acceptability of the final statement.

[15] Petitioners asserted—and the A&B and State Defendants admitted in their respective answers to Petitioners' amended complaint—that no EA has ever been completed in connection with the revocable permits.

up to 8.4 million gallons per day could still be diverted to the County for the public health, safety, and welfare of existing customers served by East Maui surface-water diversions.

1.    **Petitioners' Motion for Partial Summary Judgment and the A&B Defendants' Cross-Motion for Partial Summary Judgment**

On October 21, 2015, Petitioners filed a motion for partial summary judgment ("MPSJ") asking the circuit court to:

> A.   Declare that Defendants [A&B] and [EMI] violated HRS chapter 343.
>
> B.   Declare that the [State Defendants] violated HRS chapter 343.
>
> C.   Declare that [the revocable permits] are null and void.
>
> D.   Declare that Defendants [A&B] and [EMI] have no legal or statutory authority to continue using the land areas or diverting water covered by [the revocable permits].
>
> E.   Declare that [the State Defendants] have no legal or statutory basis to authorize Defendants A&B and EMI's continued use of land areas or diversion of water covered by [the revocable permits].

The A&B Defendants filed a cross-MPSJ, which was joined by the State Defendants and the County.  Opposing Petitioners' MPSJ, the A&B and State Defendants argued that the decision authorizing the use of State lands occurred on May 26, 2000, when the revocable permits were first issued, and that the annual review process and continuation of the revocable permits did not constitute "use of State land" or "applicant action" for which an EA was required under HEPA.  The A&B Defendants contended, moreover, that Petitioners' complaint and MPSJ, actually constituted an untimely challenge to the 2002 holdover

12

decision.  Petitioners disputed that they were "relitigating the 2002 holdover[ decision]'s validity" and responded that the 2002 holdover decision "ha[d] no legal significance" and that the BLNR's 2014 continuation decision was "[t]he only relevant decision" at issue.

### 2.  Circuit Court's Order

The circuit court granted Petitioners' MPSJ.  In a minute-order decision, the circuit court found that the BLNR's 2014 continuation decision was not HEPA "action" requiring an EA, but held that the revocable permits were, nonetheless, invalid because they exceeded the BLNR's authority under HRS chapter 171 to issue temporary permits:

> At the outset, the December 2014 revocable permits are not "actions" subject to Chapter 343 environmental assessment requirements.  The December 2014 revocable permits were not programs or projects INITIATED by DLNR, BLNR, or the Defendants.  Instead, the December 2014 revocable permits were of a continuing (preserving the status quo), temporary nature placing the occupancy of the lands in a holdover status.  Nevertheless, both HRS §§ 171-40[16] and 171-55

---

[16]    HRS § 171-40 (2011) provides:

Upon expiration of the lease term, if the leased land is not otherwise disposed of, the board of land and natural resources may allow the lessee to continue to hold the land for a period not exceeding one year upon such rent, terms, and conditions as the board may prescribe; provided that if, immediately prior to the expiration of the lease, the land was cultivated with crops having ratoons for at least one cycle, as defined hereinafter, the board may permit the lessee to continue to hold the leased land until the crops from the last remaining cycle have been harvested.  The term "cycle" as used in this section means the period required to plant and cultivate the original crop, including the harvesting of the first ratoon, being a period exceeding two years.

(continued . . . )

13

> speak to the "temporary" nature of the permits, notwith-
> standing affording the board discretion to continue the
> permit on a month-to-month basis for additional one year
> periods. Temporary is not statutorily defined under Chap-
> ter 171. Black's Law Dictionary, 10th Edition, speaks to
> "temporary" as "lasting for a time only; existing or con-
> tinuing for a limited (usu. short) time; transitory."
>
> The revocable permits expired on June 30, 2001. The Decem-
> ber 2014 revocable permits which were either continued or
> renewed on a holdover status (uninterrupted for the last 13
> years through December 2014) are not "temporary" as envi-
> sioned under Chapter 171. Otherwise, hold-over tenants
> could arguably be allowed to temporarily occupy "public
> lands", almost in perpetuity for continuous, multiple one-
> year periods, which would not be in a manner consistent
> with the public interest or legislative intent. (e.g., fi-
> nite terms are set forth throughout Chapter 171, see HRS
> § 171-36, § 171-54, § 171-58.)

(Emphasis added.) The circuit court granted Petitioners' MPSJ,

invalidated the revocable permits, and denied the A&B

Defendants' cross-MPSJ. In its order, the circuit court

emphasized that the BLNR had exceeded its authority under HRS

chapter 171 to authorize temporary disposition of water rights

in holding over the revocable permits for over a decade:

> [P]ursuant to HRS § 171-58(c), the BLNR authorized A&B's
> use on a holdover basis. This holdover status has contin-
> ued uninterrupted for the last 13 years. HRS §§ 171-10[17]
> and 171-55 authorize the "temporary" occupation of public
> lands. A&B's continuous uninterrupted use of these public
> lands on a holdover basis for the last 13 years is not the
> "temporary" use that HRS Chapter 171 envisions. See also

---

(. . . continued)

> Upon expiration of the one-year extension, if the board has
> not yet decided upon the re-lease of the land or
> reservation for other purposes, the board may issue a
> temporary permit to the lessee, subject to section 171-55
> and the rent and such other terms and conditions as the
> board may prescribe.

[17] It appears that the circuit court mistakenly wrote "HRS § 171-10" when it meant to write "HRS § 171-40," as it did in its minute order. HRS § 171-10 (2011) does not authorize temporary occupations of public lands; it sets out the classifications of public lands used by the BLNR.

14

> Black's Law Dictionary, 10th edition.  Otherwise, holdover tenants could arguably be allowed to occupy public lands almost in perpetuity for continuous, multiple one-year periods.  <u>Such a prospect is inconsistent with the public interest and legislative intent.</u>

(Emphasis added.)

## D.    ICA Proceedings

The A&B Defendants, the State Defendants, the County, and Petitioners all appealed the circuit court's order. Petitioners argued that the circuit court erred by holding that the BLNR's 2014 continuation decision did not constitute "action" subject to a mandatory EA under HEPA.  HRS § 343-5(a)(1).  However, Petitioners asserted that the circuit court did not err in granting their MPSJ, that a correct decision should not be disturbed on the grounds of incorrect reasoning, and that they filed their cross-appeal "in an abundance of caution."  The A&B Defendants argued that the circuit court erred by: (1) granting Petitioners' MPSJ despite its finding that the BLNR's 2014 continuation decision was not "action" subject to HEPA's EA requirement; and (2) granting Petitioners' MPSJ when genuine issues of material fact existed as to whether the BLNR's 2014 continuation decision constituted "action" within the meaning of HRS § 343-5(a)(1).[18]

---

[18]    The A&B Defendants also argued that the circuit court erred by: invalidating the revocable permits based on the BLNR's authority (or lack thereof) under HRS chapter 171, when the only basis for relief asserted by Petitioners was under HEPA, and invalidating the revocable permits when the BLNR had the authority to issue such permits under the public trust doctrine. The County and State Defendants advanced similar arguments on cross-appeal.

(continued . . . )

15

On June 18, 2019, the ICA filed a memorandum opinion vacating the circuit court's order and remanding the case for further proceedings.  The ICA found that although HRS § 171-58 did not give the BLNR authority to extend the revocable permits past one year of their issuance (i.e., past July 1, 2001), HRS § 171-55 authorized the BLNR to place the revocable permits in holdover status so long as the revocable permits were "temporary" and "serve[d] the best interests of the State."  The ICA reasoned that the BLNR had authority under HRS § 171-55, "[n]otwithstanding any other law to the contrary"—that is, notwithstanding HRS § 171-58's limitation of temporary permits to a "maximum term of one year."  The ICA found there were genuine issues of material fact as to whether the BLNR's 2014 continuance decision (1) was "temporary" or "de facto indefinite," and (2) "serve[d] the best interests of the State" under HRS § 171-55, and held that the circuit court erred by granting Petitioners' MPSJ.

---

(. . . continued)

The ICA found "no merit" to the Defendants' arguments that they were not on notice as to the issue of an HRS chapter 171 violation, and construed the HRS chapter 171 issue as if it had been raised in the pleadings, holding that it was "tried by implied consent."  The ICA noted that the A&B and State Defendants had argued in their opposition memoranda to Petitioners' MPSJ that the ongoing validity of the revocable permits came not from the BLNR's 2014 continuation decision, but "instead derived from a continuance of the [2002] holdover status," which was authorized under HRS chapter 171.

16

Finally, the ICA found that HRS § 171-55's "notwithstanding" clause "nullified" HEPA's EA requirement for temporary permits issued under HRS § 171-55, and held that the circuit court did not err in finding HEPA inapplicable, even though it used different reasoning. The ICA concluded that the purpose of HRS § 171-55 is to allow the BLNR to issue temporary permits to an applicant pursuing a long-term lease and that the BLNR's 2014 continuation decision was not subject to HEPA's EA and Environmental Impact Statement ("EIS") requirements.

**E.   Supreme Court Proceedings**

On certiorari, Petitioners contend that the primary question is "what lawful authority, if any, BLNR acted under when it placed the challenged revocable permits in holdover status and thereafter continued to maintain them in holdover status for over a decade," and urge us to conclude that the BLNR acted with no lawful authority.[19] Petitioners present five questions:

> 1.  Does HRS chapter 343 apply to BLNR's decision to continuously renew revocable permits authorizing the daily use of public lands to divert millions of gallons of water on a holdover basis for over a decade and counting?
>
> 2.  Does HRS § 171-55 allow for the renewal of revocable permits for the use of state land and water indefinitely despite the maximum term of one year prescribed by HRS § 171-58 for the disposition of water rights specifically?

---

[19]    The Sierra Club, Maui Tomorrow, and Mahi Pono LLC filed amicus curiae briefs in support of Petitioners.

17

> 3.  Did the Circuit Court err by refusing to grant summary judgment to Petitioners on the grounds set forth in counts 1 and 2 of their First Amended Complaint?
>
> 4.  Did the ICA err by concluding HRS § 171-55's "notwithstanding any other law to the contrary" language nullifies (a) the maximum term of one year prescribed by HRS § 171-58 for "temporary" revocable permits and (b) HRS chapter 343 EA and environmental impact statement (EIS) requirements for "temporary" revocable permits where such interpretations conflict with well-settled case law, are unsupported by the legislative history, and run contrary to the plain meaning of the statutes?
>
> 5.  Did the ICA err by refusing to rule that BLNR's decision to renew the Revocable Permits on a holdover basis violated HRS chapter 171-55 as a matter of law due to BLNR's failure to make findings that the permits are "temporary" and serve the "best interests of the State"?

Petitioners argue that the ICA erred by ignoring rules of statutory construction, which led to an incorrect interpretation of HRS § 171-55 and the erroneous conclusion that HRS § 171-55's "notwithstanding" clause implicitly exempts temporary revocable permits from compliance with (1) HEPA's EA requirement and (2) HRS § 171-58's one-year limit on revocable permits.  Petitioners also argue that the ICA erred by upholding the revocable permits when the BLNR had not made explicit findings pursuant to HRS § 171-55 that "the permit holder's occupancy [was] temporary" and that the permit was issued "under conditions and rent which will serve the best interests of the State."

The State Defendants assert that both HRS § 171-55 and the public trust doctrine supported the BLNR's 2014 continuance decision.  The State Defendants argue that HRS § 171-55 (1) is the applicable statute in this case, and (2) does not conflict with HRS § 171-58, which is not applicable to the disposition of

18

water rights during the pendency of a contested case. The State Defendants claim that HRS § 171-55's "notwithstanding" clause applies not only to the public auction requirement, but to <u>any</u> contrary law, including HEPA's EA requirement. Finally, the State Defendants contend that Petitioners' argument that the revocable permits are invalid is moot because the permits, continued in 2014 for the year 2015, have long since expired "and it would be pointless to re-examine the basis for continuance."

The A&B Defendants add that Petitioners no longer have an adverse interest in the case, rendering their claims moot. The A&B Defendants claim "things have materially changed" since Petitioners initiated this case, namely, that: sugar cultivation has ceased, decreasing the water diverted subject to the revocable permits to a fraction of what it was before; the Commission on Water Resource Management ("CWRM") has set interim instream flow standards, ensuring that Petitioners have sufficient water to support their customary and traditional practices; a draft EIS ("DEIS") relating to the long-term lease has been published; and the BLNR has capped the diversions allowed under the revocable permits to 45 million gallons of water a day for 2020. The A&B Defendants also contend that, as a consequence of the CWRM's actions and the publication of the DEIS, Petitioners no longer have an "effective remedy." They

argue further that this case does not fall under the exception to the mootness doctrine for cases that are capable of repetition yet evading review because the BLNR has approved the continuation of the revocable permits for 2020 and a long-term lease is anticipated to be issued shortly thereafter, meaning that the revocable permits "will not be needed much longer."

The County adds that Petitioners' interpretation of HRS § 171-55 would lead to absurd results:  a "regulatory morass [that] would apply to hundreds of [revocable] permits" that would require the BLNR to perform independent environmental reviews for each revocable permit in every case where there is a pending long-term lease.  The County contends that this regulatory burden would prevent the BLNR from authorizing the use of State land and, more importantly, water "that is necessary to the health, safety and welfare of 35,000 residents in upcountry Maui."

## II.   STANDARDS OF REVIEW

### A.   Summary Judgment

> On appeal, the grant or denial of summary judgment is re-
> viewed *de novo.*  Summary judgment is appropriate if the
> pleadings, depositions, answers to interrogatories, and ad-
> missions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact
> and that the moving party is entitled to judgment as a mat-
> ter of law.

Villaver v. Sylva, 145 Hawaiʻi 29, 34, 445 P.3d 701, 706 (2019) (internal quotation marks, citations, and brackets removed)

(quoting Nuʻuanu Valley Ass'n v. City & Cnty. of Honolulu, 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008)).

**B.    Statutory Interpretation**

"Statutory interpretation is a question of law reviewable de novo."  State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009) (internal quotation marks omitted) (quoting Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007)).  This court's construction of statutes is guided by the following:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

Id.  When there is ambiguity in a statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning."  Id.  A court may also resort to extrinsic aids in determining legislative intent, such as legislative history or the reason and spirit of the law.  Id.

21

## C.    Constitutional Law

"Questions of constitutional law are reviewed de novo, under the right/wrong standard."  In re Gas Co., 147 Hawai'i 186, 198, 465 P.3d 633, 645 (2020).

### III.   DISCUSSION

## A.    The Public Interest Exception to the Mootness Doctrine Applies to Petitioners' Appeal

Defendants contend that Petitioners' appeal is moot because: the revocable permits continued by the BLNR in December 2014 have "long expired"; changed circumstances have eliminated Petitioners' adverse interest; and A&B published a DEIS in September 2019, which precludes this court from ordering an effective remedy.  Defendants also contend that the exception from the mootness doctrine for cases that are capable of repetition yet evading review does not apply.  Though Defendants are correct that the continuance granted by the BLNR in 2014 has expired and A&B has published a DEIS, Petitioners' appeal qualifies under the "capable of repetition, yet evading review" and public interest exceptions to the mootness doctrine.

Under the mootness doctrine, this court will generally refrain from deciding a case that has "lost its character as a present, live controversy," and in which "the reviewing court can no longer grant effective relief."  In re Marn Family, 141 Hawai'i 1, 7, 403 P.3d 621, 627 (2016) (quoting Cnty. of Haw. v. Ala Loop Homeowners, 123 Hawai'i 391, 405, 235 P.3d 1103, 1117

22

(2010), abrogated on other grounds by Tax Found. of Haw. v. State, 144 Hawai'i 175, 439 P.3d 127 (2019)).  "However, this court has explicitly recognized two exceptions to the mootness doctrine: (1) the 'capable of repetition, yet evading review' exception . . . and (2) the public interest exception." Hamilton ex rel. Lethem v. Lethem, 119 Hawai'i 1, 5, 193 P.3d 839, 843 (2008).[20]

The "capable of repetition, yet evading review" exception provides that "a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit." Id. (quoting In re Thomas, 73 Haw. 223, 226-27, 832 P.2d 253, 255 (1992)).  Although this case is moot because the 2014 continuation decision—which extended the revocable permits through 2015—has long since expired, the "capable of repetition" exception applies.  Because the BLNR's continuation decisions for revocable permits apply for only one calendar year at a time, those decisions "evade full review" and no plaintiff would be able to complete a lawsuit seeking to void the continuation

---

[20]    Although these two exceptions have sometimes been treated as though they were the same, we have more recently clarified that they are "separate and distinct."  Kaho'ohanohano v. State, 114 Hawai'i 302, 333 n.23, 162 P.2d 696, 727 n.23 (2007).

23

of a permit before the continuation itself expired.  Id.  Thus, this case satisfies the requirements for the "capable of repetition" exception to the mootness doctrine.

The second exception, the public interest exception, is broader than the "capable of repetition" exception; it overcomes Defendants' contention that because the 2014 continuation decision has expired and a DEIS has been published, Petitioners no longer have an adverse interest or an effective remedy.  In determining whether the public interest exception applies, this court considers "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question."  Kaleikini v. Thielen, 124 Hawai'i 1, 12–13, 237 P.3d 1067, 1078–79 (2010) (quoting Hamilton, 119 Hawai'i at 6–7, 193 P.3d at 844–45).  In this case, all three factors weigh in favor of applying the public interest exception.

The first factor considers whether the questions presented by the case are "personal to" the parties and "of a private nature," or if they implicate broader "political and legislative issues that affect a significant number of Hawai'i residents."  Hamilton, 119 Hawai'i at 7, 193 P.3d at 845.  Here, although "the underlying proceedings are, at bottom, a private battle" between different users of water, Doe v. Doe, 116 Hawai'i

24

323, 327, 193 P.3d, 1067, 1071 (2007), the disposition of the water rights at issue directly affects a broad swath of the Maui community and these proceedings have required the involvement and input of numerous State agencies. Thus, the first factor weighs in favor of applying the public interest exception.

As to the second factor, this court's analysis in the present case will provide necessary guidance to public officers in the future. The record indicates that the BLNR continues hundreds of revocable permits yearly. Given this practice, clarification of the BLNR's authority to issue revocable permits under HRS § 171-58 and to continue such permits under HRS § 171-55 would be of significant value to the BLNR and DLNR officials who oversee the administration of the revocable-permit system. Clarifying whether the BLNR is or is not required to conduct (or order applicants like the A&B Defendants to conduct)[21] EAs and/or EIS's under HEPA when continuing revocable permits would also be of value to these officials. Thus, the second factor weighs in favor of applying the public interest exception.

---

[21] The A&B Defendants contend that this court cannot order effective relief because A&B has already prepared and published a DEIS. As Petitioners note, the DEIS was published in 2019 and is not part of the record on appeal. Moreover, the scope of this case is not limited to the A&B Defendants' unilateral decision to prepare an EIS; a core issue focuses on whether the BLNR was (1) authorized to continue the revocable permits under HRS chapter 171 and (2) required to conduct or order the permit applicants to conduct EAs and/or EIS's under HEPA. Thus, the fact that a DEIS has been published does not render Petitioners' appeal moot.

Finally, as to the third factor, which considers whether the issue will recur in the future, there is a strong likelihood that the question of whether it is permissible for an agency to continue revocable permits will recur. As noted above, the BLNR continues hundreds of revocable permits every year. Disputes over the use of land and State resources are frequent in Hawai'i, and given the ubiquity of these revocable permits, disputes over revocable permits are likely to arise in the future. See Ala Loop Homeowners, 123 Hawai'i at 405-06, 235 P.3d at 1117-18 (noting the "volume of land development activity in the State" in the context of individual enforcement actions concerning the Land Use Commission). In other words, "[r]esolution of the issue may affect similarly situated parties who in the future seek to assert their right[s] . . . in proceedings before agencies and other governmental bodies." In re Maui Elec. Co., 141 Hawai'i 249, 257, 408 P.3d 1, 9 (2017). Thus, the third factor weighs in favor of applying the public interest exception.

Given that all three factors weigh in favor of applying the public interest exception, Petitioners' appeal is not barred by the mootness doctrine.

B.   **Statutory and Constitutional Authority for the 2014 Continuation Decision**

The ICA found that although the BLNR's 2014 continuation decision was not authorized by HRS § 171-58, which

26

limits the disposition of water rights by temporary permit to a maximum term of one year,[22] it was potentially authorized by HRS § 171-55, which allows the BLNR to continue revocable permits on a month-to-month basis for successive one-year periods.[23]  HRS § 171-58 expressly limits the temporary disposition of water rights to a maximum term of one year; thus, the ICA was correct in finding that the BLNR's 2014 continuation decision was not authorized under HRS § 171-58.  Next, the ICA held that although HRS § 171-55 potentially authorized the BLNR in 2014 to place the revocable permits in holdover status for a year, there were genuine issues of material fact as to whether the BLNR's continuance decision (1) was "temporary" or "de facto indefinite," and (2) "serve[d] the best interests of the State," such that it was inappropriate to dispose of this case at the summary judgment stage.

The ICA erred by ruling on the basis of perceived issues of material fact.  HRS § 171-55 did not authorize the BLNR's 2014 continuation decision because the BLNR did not make

---

[22]    HRS 171-58(c) states, in relevant part, that "[d]isposition of water rights may be made by lease at public auction as provided in this chapter or by permit for temporary use on a month-to-month basis under those conditions which will best serve the interests of the State and subject to a maximum term of one year and other restrictions under the law."  (Emphasis added.)

[23]    HRS § 171-55 states, in relevant part, that "[a] permit on a month-to-month basis may continue for a period not to exceed one year from the date of its issuance; provided that the board may allow the permit to continue on a month-to-month basis for additional one year periods."  (Emphasis added.)

factual findings or enter conclusions of law positing that it was serving the State's best interests. As a trustee of the public trust, the BLNR failed to demonstrate that it properly exercised the discretion vested in it by the constitution and the statute.

1. **HRS § 171-58 limits temporary disposition of water rights to a maximum of a year and did not authorize the BLNR to continue the revocable permits in 2014.**

As an initial matter, HRS § 171-58 titled,—"Minerals and water rights"—is applicable to the instant case. As the ICA noted, the revocable permits themselves stated that they were originally issued "pursuant to [HRS] section 171-58." Since the BLNR would have no authority to make continuation decisions without valid revocable permits in the first place, the ICA did not err by considering whether the BLNR's actions subsequent to the issuance of the revocable permits were authorized under HRS § 171-58.

As the ICA concluded, HRS § 171-58 conferred authority on the BLNR to issue one-year revocable permits, but did not authorize the BLNR to extend the revocable permits past one year of their issuance, that is, past July 1, 2001. As noted above, HRS § 171-58 limits temporary permits for water rights to a term of one year:

> Disposition of water rights may be made by lease at public auction as provided in this chapter or by permit for temporary use on a month-to-month basis under those conditions which will best serve the interests of the State

28

> <u>and subject to a maximum term of one year</u> and other restrictions under the law[.]

HRS § 171-58(c) (emphasis added). The "fundamental starting point for statutory interpretation is the language of the statute itself" and "where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." <u>Wheeler</u>, 121 Hawai'i at 390, 219 P.3d at 1177 (quoting <u>Citizens Against Reckless Dev.</u>, 114 Hawai'i at 193, 159 P.3d at 152). The language of HRS § 171-58 plainly and unambiguously limits temporary revocable permits to "a maximum term of one year" with no exceptions or conditions within § 171-58 that would allow the BLNR to extend a permit beyond that maximum term.

Moreover, HRS § 171-58 should be read in contrast with HRS § 171-55. <u>See</u> <u>Wells Fargo Bank, N.A. v. Omiya</u>, 142 Hawai'i 439, 450, 420 P.3d 370, 381 (2018) (citing the canon of construction that laws <u>in pari materia</u>, or on the same subject matter, may be considered together). Significantly, HRS § 171-55 provides that a permit issued under that section "may continue for a period not to exceed one year from the date of its issuance; <u>provided that the board may allow the permit to continue on a month-to-month basis for additional one year periods</u>." (Emphasis added.) By contrast, HRS § 171-58 omits this and any similar language, bolstering the conclusion that permits issued under its authority may not be renewed for

additional one-year periods.  Read together, it is clear that the former statute authorizes permits to be renewed for multiple one-year periods while the latter does not.

Thus, the ICA did not err in finding that the BLNR was not authorized under HRS § 171-58 to continue the revocable permits in 2014.

2.   **HRS § 171-55 did not authorize the BLNR's 2014 continuation decision because the BLNR did not demonstrate that the revocable permits served the best interests of the State.**

Defendants contend that the BLNR's 2014 continuation decision was authorized under HRS § 171-55.

HRS § 171-55 states:

> Notwithstanding any other law to the contrary, the board of land and natural resources may issue permits for the temporary occupancy of state lands or an interest therein on a month-to-month basis by direct negotiation without public auction, under conditions and rent which will serve the best interests of the State, subject, however, to those restrictions as may from time to time be expressly imposed by the board.  A permit on a month-to-month basis may continue for a period not to exceed one year from the date of its issuance; provided that the board may allow the permit to continue on a month-to-month basis for additional one year periods.

(Emphasis added.)

The ICA agreed that the BLNR had authority under HRS § 171-55 to continue the revocable permits in 2014, so long as the continuation of the revocable permits was "temporary" and "serve[d] the best interests of the State."  HRS § 171-55. However, the ICA concluded that there were genuine issues of material fact as to whether the BLNR's 2014 continuation

30

decision (1) was "temporary" or "de facto indefinite," and (2) "serve[d] the best interests of the State" under HRS § 171-55.

While the ICA correctly held that HRS § 171-55 potentially authorized the BLNR to continue the revocable permits,[24] the ICA erred by ruling on the basis of perceived issues of fact. First, the permits were "temporary" within the meaning of the statute. Second, the BLNR failed to demonstrate that the 2014 continuation of the revocable permits "serve[d] the best interests of the State." HRS § 171-55. Because the BLNR did not make factual findings or enter conclusions of law positing that the permits served the State's best interests, the BLNR failed to demonstrate that it properly exercised the discretion vested in it by the constitution and the statute.

### a. The revocable permits were temporary within the meaning of HRS § 171-55.

Unlike the ICA, which found there to be genuine factual questions related to whether the permits were temporary, the circuit court held that the revocable permits, "uninterrupted for the last 13 years" and continued by the BLNR's 2014 decision, were not "'temporary' as envisioned under

---

24  This holds true notwithstanding that there is a more specific statute, HRS § 171-58, that deals with water rights. HRS § 171-55 authorizes dispositions of "state lands or an interest therein." In turn, HRS § 171-1 (2011) defines "land" to include "all interests therein . . . including water." Thus, HRS § 171-55's reference to "lands" also authorizes the BLNR to dispose of water rights.

Chapter 171."  (Citing <u>Temporary</u>, Black's Law Dictionary (10th ed. 2014) (defining "temporary" as "lasting for a time only; existing or continuing for a limited [] time; transitory").) The circuit court reasoned that if the revocable permits were "temporary," then "holdover tenants could arguably be allowed to occupy public lands almost in perpetuity for continuous, multiple one-year periods," which would be "inconsistent with the public interest and legislative intent."

The term "temporary" must be read in the context of the entirety of HRS § 171-55, which expressly allows a permit to be continued "for a period not to exceed one year from the date of its issuance; provided that the board may allow the permit to continue on a month-to-month basis for additional one year periods."  HRS § 171-55.  "Temporary," as used in HRS § 171-55, is used to distinguish revocable permits from long-term leases; it refers to the month-to-month nature of revocable permits and that such permits may last without additional approval for only one year.  The term "temporary" does <u>not</u>, however, prohibit annual renewal of permits.  In fact, HRS § 171-55 <u>explicitly</u> <u>authorizes</u> the BLNR to continue revocable permits for "additional one year periods."  Thus, the BLNR's 2014 continuation decision was not precluded by HRS § 171-55's use of the term "temporary."

b. **The BLNR did not sufficiently demonstrate that the 2014 continuation decision served the best interests of the State.**

The BLNR's authority to make the 2014 continuation decision was, however, limited by HRS § 171-55's mandate that the issuance or continuance of a revocable permit "serve the best interests of the State." The BLNR did not make factual findings or enter conclusions of law positing that it was serving the State's best interests when it made its 2014 continuation decision that wholesale continued the revocable permits along with more than 300 other permits. Thus, the 2014 continuation decision was not authorized by HRS § 171-55 because the BLNR did not sufficiently demonstrate that it considered the "best interests of the State" as required by the statute and the BLNR's obligation as a public trustee.

As an initial matter, what constitutes "the best interests of the State" is not explained by the statute. However, particularly when appraising the legislative history of HRS chapter 171 as a whole, it is clear that the BLNR's power to issue and continue revocable permits under HRS § 171-55 was intended to be narrowly exercised.

Many of the provisions currently codified in HRS chapter 171 that govern the management and disposition of public lands were enacted in a 1962 omnibus public-lands bill, Act 32. Act 32 was an urgency measure passed to provide "a set of laws

33

for the management and disposition of our public lands in accordance with present day needs."  1962 Haw. Sess. Laws Act 32, § 1 at 95.  Act 32 contained numerous provisions emphasizing that the public-auction process would be the predominant means by which state lands would be leased.  For example, Revised Laws of Hawai'i ("RLH") § 103A-14, titled, "Auction," provided that "[e]xcept as otherwise specifically provided, all dispositions of public lands shall be made at public auction after public notice as provided in section 16 of this chapter."[25]  1962 Haw. Sess. Laws Act 32, § 2 at 101 (emphasis added).  Similarly, RLH § 103A-32, titled, "Policy," stipulated that "[u]nless otherwise specifically authorized in this chapter or by subsequent legislative acts, all dispositions shall be by lease only, disposed of by public auction in accordance with the procedure set forth in sections 14 and 15 of this chapter."[26]  1962 Haw. Sess. Laws Act 32, § 2 at 109 (emphasis added).  These provisions evinced a strong legislative preference for public auction.[27]  A 1962 standing committee report further explained

---

[25]    RLH § 103A-14 is now codified as HRS § 171-14 (2011) and has remained substantively unchanged since its enactment.

[26]    RLH § 103A-32 is now codified as HRS § 171-32 (2011) and has remained substantively unchanged since its enactment.

[27]    In circumstances where disposition by public auction is not possible or appropriate (for example, the issuance of land licenses), the replacement disposition process must serve the public interest.  See HRS § 171-54 ("The board of land and natural resources may issue land licenses affecting public lands for a period not exceeding twenty years.  No land

(continued . . . )

that non-public-auction sales were to be permitted only in cases

of "overriding public interest" and that lease negotiations were

appropriate only "in certain limited situations":

> Your Committee believes that this bill, as amended, incorporates a sound policy for the administration, management, and disposition of the public lands of the State. Every consideration has been given throughout the bill, particularly in the disposition sections, to adequately preserve the assets of the State <u>by authorizing only leases disposable only by public auction, except where an overriding public interest necessitates the disposition by sales in fee simple or by leases without public auction.</u> These overriding considerations are seen in the need for houselots, for small personally occupied farm, dairy and pasture lots, and in cases of natural disasters. Due regard was also given that <u>in certain limited situations, negotiations for leases should be permitted.</u>

H. Stand. Comm. Rep. No. 240, in 1962 House Journal, at 356

(emphasis added). The standing committee report also reflects

the legislature's original intent that the disposition of State

land by non-public-auction lease would be limited to a narrow

set of circumstances, such as "houselots, . . . small personally

occupied farm, dairy and pasture lots, and . . . natural

disasters." <u>Id.</u>

The legislative history of HRS § 171-55 also reveals

the legislature's efforts to constrain the use of revocable

permits by requiring annual review. HRS § 171-55 has remained

---

(. . . continued)

license shall be disposed of except at public auction as provided in this chapter; provided that the board may . . . dispose of a land license by negotiation, without recourse to public auction, <u>if it determines that the public interest will best be served thereby.</u> The disposition of a land license by negotiation <u>shall be upon such terms and conditions as the board determines shall best serve the public interest.</u>" (emphasis added)).

relatively unchanged, substantively, since it was first enacted

in 1962 as RLH § 103A-52, a provision of Act 32.[28]  In 1967, the

legislature amended the second sentence of RLH § 103A-52 to

clarify that while annual continuations of a revocable permit

were permitted, the BLNR would have to approve each continuation

annually:[29]

> Section 103A-52 is amended to require that at the end of
> each year during a continuance of a permit, the board must
> give its approval before a permit may be continued.  It is
> intended that a permit on a month to month basis shall be
> for a duration of one year unless extended by the board.
> At the end of each year, if the permit on a month to month
> basis is extended for another year, the board approval must
> be had.  Certain language clarity was necessary inasmuch as
> existing law does not expressly state that a periodic annu-

---

[28]    As originally enacted, RLH § 103A-52 stated:

> The board may issue permits for the temporary occupancy of
> State lands or interest therein on a month-to-month basis
> under such conditions which will serve the best interests
> of the State, subject, however, to such restrictions as may
> from time to time be expressly provided by law.  Where such
> permit on a month-to-month basis extends for a period
> beyond one year from the date of issuance, any renewal of
> the permit beyond such one year period shall be only upon
> approval of the board.

1962 Haw. Sess. Laws Act 32, § 2 at 116.

[29]    The second sentence of RLH § 103A-52 originally read:

> Where such permit on a month-to-month basis extends for a
> period beyond one year from the date of issuance, any
> renewal of the permit beyond such one year period shall be
> only upon approval of the board.

1962 Haw. Sess. Laws Act 32, § 2 at 116.  The above sentence was deleted and
replaced with the following:

> Such permit on a month to month basis may continue for a
> period not to exceed one year from the date of its issu-
> ance; provided, that the board may allow such permit to
> continue on a month to month basis for additional one year
> periods.

1967 Haw. Sess. Laws Act 234, § 11 at 355 (emphasis added).

> al review is required but may be construed to mean that on-
> ly one initial review is necessary after the first one year
> period.

H. Stand. Comm. Rep. No. 522, in 1967 House Journal, at 670 (emphasis added).  In 1990, the legislature amended HRS § 171-55 to include its current language by adding, in relevant part, the "[n]otwithstanding any other law to the contrary" clause and language stating that the BLNR could issue temporary permits "by direct negotiation and without public auction."  1990 Haw. Sess. Laws Act 90, § 1 at 165-66.  The legislative history indicates that this amendment was intended to make "absolutely clear" that the BLNR had the ability to approve permits without public auction.  S. Stand. Comm. Rep. No. 2988, in 1990 Senate Journal, at 1218.

Thus, the legislative history of HRS chapter 171 and HRS § 171-55 demonstrates the legislature's intent that temporary permits without public auction should be issued only in cases of "overriding public interest" and subject to annual review by the BLNR.  While attempts were made by the legislature to clarify that the BLNR had the authority <u>in certain situations</u> to issue temporary permits without public auction, nothing in the legislative history indicates that temporary permitting could or should be used as a long-term substitute for the

public-auction process.[30]  In the present case, the BLNR
continued the revocable permits for more than ten years[31]—using a
sweeping process that applied to hundreds of other permits—
without scrutiny and without an adequate explanation as to why a
continuance served the best interests of the State.

Because the BLNR did not make any findings of fact or
conclusions of law demonstrating that the revocable permits
"serve[d] the best interests of the State," the BLNR did not
comply with HRS § 171-55 or its public trust obligations.  "The
Hawai'i Constitution adopts the public trust doctrine as a
fundamental principle of constitutional law."  Kauai Springs,
Inc. v. Plan. Comm'n of Kauai, 133 Hawai'i 141, 171, 324 P.3d
951, 981 (2014) (cleaned up).  The public trust encompasses all
the water resources in the state, and it requires that state
agencies "must take the initiative in considering, protecting,
and advancing public rights in the resource at every stage of
the planning and decision-making process."  Id. at 172-73, 324
P.3d at 982-83.  In particular, where an agency performs as a

---

[30]    There is evidence that at least one legislator, the chair of the
House Committee on Lands, expressly disapproved of using temporary permitting
as a matter-of-course alternative for leases sold at public auction:  before
Act 32 was passed, during floor debate of the bill, he posited that one of
the goals of Act 32 "was to get the State out of the business of having so
many revokable [sic] permits for ten and twelve years."  1962 House Journal,
at 210 (exchange between Representatives Milligan and McClung).

[31]    This does not include the 2001 and 2002 holdover decisions, but
counts from the first continuation decision, made in 2005, when the revocable
permits were included on the annual master listings of permits.

trustee, it is "duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute." Id. at 173-74, 324 P.3d at 983-84 (emphasis added) (quoting In re Water Use Permit Applications, 94 Hawai'i 97, 158, 9 P.3d 409, 470 (2000)).

In this case, the 2014 continuation decision was not authorized by HRS § 171-55 because the BLNR did not make any findings of fact or conclusions of law.[32] The BLNR failed to demonstrate that it properly exercised the discretion vested in it by the constitution and the statute.[33]

In sum, the BLNR's failure to make findings here was particularly troubling in light of the magnitude of the water diversions authorized and the BLNR's role as a public trustee of the State's water resources. While we do not fully set out the scope of the BLNR's duty to make the requisite findings, we note that the duty may vary in conjunction with the resources implicated. At minimum, the BLNR must make findings "sufficient

---

[32] The A&B Defendants' role under the revocable permits in delivering water "for residential domestic use, businesses, government institutions, schools, churches, farms, non-profits, fire prevention, and Hawaiian Homelands homesteads in Upcountry Maui" is worth noting.

[33] We find no merit in the A&B and State Defendants' argument that the BLNR's 2014 continuation decision was issued in accordance with the public trust doctrine. As this court has held—and as the BLNR recognized in a 2007 order issued in the contested case proceedings—"private commercial use" is not "a protected 'trust purpose.'" In re Water Use Permit Applications, 94 Hawai'i at 138, 9 P.3d at 450. Thus, the fact that some of the water would be used for public purposes does not necessarily justify the continued use of the remaining water for commercial purposes.

to enable an appellate court to track the steps that the agency took in reaching its decision." Kauai Springs, 133 Hawai'i at 173, 324 P.3d at 983 (citing Kilauea Neighborhood Ass'n v. Land Use Comm'n, 7 Haw. App. 227, 230, 751 P.2d 1031, 1034 (1988)).

## C. Applicability of HEPA to the Revocable Permits

### 1. HRS § 171-55's "notwithstanding" clause does not nullify HEPA's EA requirement.

In the present case, the State and the A&B Defendants argue that "there is a fundamental conflict between [HRS] § 171-55 and the EA and EIS requirements of [HEPA]." Defendants assert that the mandate in HRS § 343-5(a) that "an [EA] shall be required" for certain actions conflicts with HRS § 171-55's provision authorizing the BLNR to issue revocable permits. Thus, because HRS § 171-55 also provides that it applies "[n]otwithstanding any other law to the contrary," Defendants argue that the provisions of HRS § 171-55 supersede and control over HEPA. The ICA agreed with Defendants that HRS § 171-55's "notwithstanding" clause "nullified" HEPA's EA and EIS requirements for revocable permits. We disagree: HRS § 171-55's "notwithstanding" clause does not "nullify" HEPA's EA requirement.

The first sentence of HRS § 171-55 states that "[n]otwithstanding any other law to the contrary," in certain circumstances, the BLNR may issue temporary revocable permits without public auction:

> Notwithstanding any other law to the contrary, the board of land and natural resources may issue permits for the temporary occupancy of state lands or an interest therein on a month-to-month basis by direct negotiation without public auction, under conditions and rent which will serve the best interests of the State, subject, however, to those restrictions as may from time to time be expressly imposed by the board.

(Emphasis added.)  When interpreting "notwithstanding any other law to the contrary" clauses, "[t]he term 'contrary' denotes a 'conflict.'"  State v. Schnabel, 127 Hawai'i 432, 448, 279 P.3d 1237, 1253 (2012) (citing Merriam-Webster's Collegiate Dictionary 765 (10th ed. 1989)) (interpreting a "[n]otwithstanding any other law to the contrary" clause).  "Two statutes conflict where it is not possible to give effect to both."  Id. (internal quotation marks and brackets omitted) (quoting State v. Richie, 88 Hawai'i 19, 35, 960 P.2d 1227, 1243 (1998)).  Thus, HRS § 171-55's "notwithstanding" clause has the potential to nullify HEPA's EA requirement only if it is impossible to give force to both statutes.  HRS § 171-55 does not contain an environmental-review process, and similarly, HRS § 343-5 does not address the BLNR's authority to issue revocable permits without public auction.  Because it is possible to integrate HRS § 343-5(a)'s EA requirement into the revocable-permitting process authorized by HRS § 171-55, HEPA contains no "law to the contrary" of HRS § 171-55.

Additionally, the legislative history of HRS § 171-55 supports our conclusion that the "notwithstanding" clause does

41

not create an exemption from HEPA compliance.  In 1990, the legislature amended HRS § 171-55 to include the "notwithstanding" clause.  1990 Haw. Sess. Laws Act 90, § 1 at 165-66.  The standing committee report explains the reason for the 1990 amendment:

> [T]he Office of the Attorney General has suggested that it is appropriate to make it absolutely clear that such temporary permits may be issued without public auction.  Your Committee finds that the Board of Land and Natural Resources should be allowed to issue such permits and believes that this bill should serve as the vehicle for it.
>
> Your Committee has therefore amended the bill by deleting it's [sic] substance and inserting language allowing the [BLNR] to issue permits for the temporary occupancy of State lands on a month-to-month basis by direct negotiation without public auction.

S. Stand. Comm. Rep. No. 2988, in 1990 Senate Journal, at 1218 (emphasis added).

Thus, the purpose of the "notwithstanding" language was to clarify that the BLNR has authority to issue temporary permits without public action.  The legislative history does not indicate that the "notwithstanding" clause was intended to create an exemption from HEPA or any other regulatory scheme. The "notwithstanding" clause was directed solely at the issue of whether public auction was required.

> **2.   HEPA's EA requirement applies to the revocable permits so long as the A&B Defendants' "action" does not qualify for an exemption pursuant to HRS § 343-6(a)(2).**

HEPA requires an EA "if three conditions are satisfied: (1) the proposed activity is an 'action' under HRS § 343-2 (2010); (2) the action proposes one or more of the nine

categories of land uses or administrative acts enumerated in HRS § 343-5(a) []; and (3) the action is not declared exempt pursuant to HRS § 343-6(a)(2) (2010)." Umberger v. Dep't of Land & Nat. Res., 140 Hawai'i 500, 512, 403 P.3d 277, 289 (2017).

The circuit court held that HEPA was inapplicable to the present case because it found that "the December 2014 revocable permits [we]re not 'actions' subject to [HEPA's] [EA] requirements" because the permits "were not programs or projects INITIATED by DLNR, BLNR, or the [A&B] Defendants."[34] Petitioners argue that, pursuant to HEPA, the BLNR should order the A&B Defendants to complete an EA because the A&B Defendants' activity under the revocable permits constituted "action" that involves the "use of state or county lands."[35] HRS §§ 343-2 (2010), 343-5(a)(1). Petitioners are correct. Contrary to the conclusion of the circuit court, the A&B Defendants' land use

---

[34] Although it has no bearing on this appeal, in 2003 the BLNR issued an order in the contested case proceedings for the long-term lease finding that the proposed long-term lease was "exempt from the requirements of an EA pursuant to [Hawai'i Administrative Rules ("HAR")] § 11-200-8(a)(1)" so long as "existing structures, facilities, equipment or topographical features" were kept in operation with no expansion or change of use. The circuit court reversed this finding on appeal. The BLNR issued a second order in the contested case proceedings in 2005 denying "a summary ruling that an EA must be prepared prior to any interim disposition of water such as the [2002 holdover decision] and/or a stay or continuance of the contested case proceedings with respect to the [2002 holdover decision] and the interim disposition of water." (Emphasis omitted.)

[35] Before the circuit court, in opposition to Petitioners' MPSJ, Defendants argued that the BLNR's 2014 continuation decision did not constitute "action" under HEPA because it was not a "program" or "project" that was "initiated" by the BLNR or the A&B Defendants.

43

under the revocable permits constituted "action[] that . . . [p]ropose[d] the use of state or county lands" within the meaning of HRS § 343-5(a)(1).

### a. The A&B Defendants' development, diversion, and use of water constitutes "action" within the meaning of HRS § 343-5(a).

HEPA defines "action" as "any program or project to be initiated by any agency or applicant."[36]  HRS § 343-2.  Because "program" and "project" are left undefined by HEPA, we "resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning" of those terms.  Umberger, 140 Hawai'i at 513, 403 P.3d at 290 (quoting State v. Guyton, 135 Hawai'i 372, 378, 351 P.3d 1138, 1144 (2015)).  "'Program' is generally defined as 'a plan or system under which action may be taken toward a goal.'  'Project' is defined as 'a specific plan or design' or 'a planned undertaking.'"  Id.  (footnotes omitted) (citing Merriam-Webster.com).

In the present case, the activity Petitioners contend is a HEPA "action" is the A&B Defendants' "development, diversion, and use of [the] water" located across approximately 33,000 acres of State land in Maui.  In its minute-order

---

[36]    "Agency" is defined as "any department, office, board, or commission of the state or county government which is a part of the executive branch of that government" and "applicant" is defined as "any person who, pursuant to statute, ordinance, or rule, officially requests approval for a proposed action."  HRS § 343-2.

44

decision denying Petitioners' MPSJ, the circuit court rejected

Petitioners' argument and found no HEPA "action":

> At the outset, the December 2014 revocable permits are not "actions" subject to Chapter 343 environmental assessment requirements. The December 2014 revocable permits were not programs or projects INITIATED by DLNR, BLNR, or the Defendants. Instead, the December 2014 revocable permits were of a continuing (preserving the status quo), temporary nature placing the occupancy of the lands in a holdover status.

(Emphasis added.)

While the circuit court is correct that neither the

BLNR's 2014 continuation decision nor the revocable permits

themselves are HEPA "actions," the circuit court erred by

concluding there is no HEPA "action" in the present case. As

demonstrated by our opinion in Umberger, it is the applicant's

permitted activity—i.e., the activity for which the A&B

Defendants initially sought permit approval—that constitutes

"action" within the meaning of HEPA.[37]  140 Hawai'i at 514-15, 403

P.3d at 291-92 (finding that recreational—and commercial—

aquarium collection conducted under permits issued by the DLNR

qualifies as a HEPA "action").  That the revocable permits here

were not requested by the applicant does not preclude the

permitted activity itself from qualifying as HEPA "action."

---

[37]    The A&B Defendants are "applicants" as defined by HRS § 343-2 because they sought official approval from the BLNR pursuant to a statute—i.e., revocable permits pursuant to HRS § 171-5—to engage in the "development, diversion, and use of water" back in 2000.

45

The A&B Defendants' permitted activity constitutes HEPA "action" because it qualifies as either a "project" or a program."  The activity is a "specific plan" or "planned undertaking"—and is, therefore, a "project"—because the permits facilitated a deliberate and coordinated effort by the A&B Defendants to use their water system to deliver water and manage water use for the permitted areas.  See id. at 514, 403 P.3d at 291 (finding that recreational and commercial aquarium collection was a "project" because "it involve[d] the systematic and deliberate extraction of aquatic life" using established procedures "for the specific purpose of holding captive such aquatic life for aquarium purposes").  The activity is also a "plan or system under which action may be taken"—and is, therefore, a "program"—because although each revocable permit corresponded to a separate geographical area, the four areas "were all a part of the same collection and delivery system extending from Nahiku to Honopou" and the permits worked in conjunction to meet the A&B Defendants' (and their customers') water needs.  See id. (finding that recreational and commercial aquarium collection was a "program" because it involved "the purposeful and methodical extraction of aquatic life" designed to further the "desired goal" of "tak[ing] aquatic life from its habitat and hold[ing] it in a state of captivity for aquarium purposes").  The A&B Defendants' permitted activity, whether

46

construed as a "project" or a "program," constitutes "action" within the meaning of HEPA.  HRS §§ 343-2, 343-5(a).

Additionally, the A&B Defendants' permitted activity constitutes "action" within the meaning of HEPA despite the "continuing" nature of the activity, which the defendants characterize as merely maintaining the status quo.  In Umberger, this court held that aquarium collection authorized by one-year permits from the DLNR constituted "action" under HEPA even though the aquarium collection had been occurring for years. 140 Hawaiʻi at 513-16, 403 P.3d at 290-93.  The continuing water use in this case similarly constitutes "action" under HEPA. Furthermore, because the A&B Defendants' water use was conditioned on one-year permits, the continued use under a renewed permit did not merely maintain the status quo.  See Pit River Tribe v. U.S. Forest Serv., 469 F.3d 768, 784 (9th Cir. 2006) (holding that lease extensions did not "merely preserve[] the status quo" because "[w]ithout the affirmative re-extension of the 1988 leases, [the lease applicant] would have retained no rights at all to the leased property").[38]

---

[38]    We note that HEPA contains provisions allowing agencies to consider and incorporate previous environmental review.  See HAR § 11-200.1-11; HAR § 11-200.1-12.  "These provisions alleviate the concern that an environmental assessment would necessarily have to be prepared whenever an applicant applies for [a new one-year permit]."  Umberger, 140 Hawaiʻi at 528, 403 P.3d at 305.

Next, where the "action" is proposed by an applicant and requires approval by an agency, in order for HEPA to apply the agency must "exercise[] discretionary consent in the approval process."[39] Umberger, 140 Hawai'i at 512, 403 P.3d at 289 (citing HRS § 343-5(e)).  Under HEPA, "[a]pproval" is defined as requiring "discretionary consent . . . from an agency prior to actual implementation of an action" and "[d]iscretionary consent" is defined as "consent, sanction, or recommendation from an agency for which judgment and free will may be exercised by the issuing agency."  HRS § 343-2.  The A&B Defendants' "action" required approval from the BLNR in the form of a revocable permit issued or continued pursuant to HRS § 171-55.  And the BLNR clearly exercised "discretionary consent" during the approval process.  Under HRS § 171-55, the BLNR "may issue" revocable permits and "may continue" such permits "on a month-to-month basis for additional one year periods."  "The term 'may' is generally construed to render optional,

_____

[39]    In their opening brief, Petitioners contend that the "action" here qualifies as either an "agency action" (i.e., action proposed by the BLNR) or an "applicant action" (i.e., action proposed by the A&B Defendants). The present "action" is more accurately construed as an "applicant action." The A&B Defendants "proposed" HEPA "action" by seeking the BLNR's permission to develop, divert, and use the water across the license areas, that is:  by expressly requesting that the BLNR "[a]uthorize temporary continuation of the year-to-year revocable permit[s] . . . pending issuance of the [proposed long-term] lease" in 2001.  The BLNR's 2014 continuation decision constituted such authorization, and the BLNR conveyed the authorization to the A&B Defendants.  Without the BLNR's 2014 continuation decision, the revocable permits would have expired on January 1, 2015, and the A&B Defendants would not have been authorized in their ongoing water use.  And until the long-term lease is issued, the A&B Defendants will continue to derive the authority to engage in their water use from the revocable permits.

permissive, or discretionary the provision in which it is embodied[.]" Umberger, 140 Hawai'i at 526, 403 P.3d at 303 (quoting State v. Kahawai, 103 Hawai'i 462, 465, 83 P.3d 725, 728 (2004)).  The BLNR is not required to issue or continue a revocable permit; this authority is wholly discretionary under the statute.  Thus, in continuing the revocable permits pursuant to HRS § 171-55 in 2014, the BLNR exercised "discretionary consent" in approving the A&B Defendants' "action." HRS § 343-2.

**b.    The A&B Defendants' "action" involves the use of state lands under HRS § 343-5(a)(1).**

Next, the HEPA "action" must involve at least one of the nine categories of land uses or administrative acts enumerated in HRS § 343-5(a).  Umberger, 140 Hawai'i at 512, 403 P.3d at 289.  Under HRS § 343-5(a)(1), an EA is required for actions that

> [p]ropose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects that the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies; provided further that an environmental assessment for proposed uses under section 205-2(d)(11) or 205-4.5(a)(13) shall only be required pursuant to section 205-5(b).

HRS § 343-5(a)(1) (emphasis added).

The A&B Defendants' permitted activity constitutes HEPA "action" that involves "the use of state land" under HRS § 343-5(a)(1).  The revocable permits granted the A&B Defendants the right to "[o]ccupy and use" the Honomanū, Huelo, Ke'anae, and

49

Nāhiku premises—all "parcel[s] of government land"—for the "development, diversion, and use of water."  The A&B Defendants' "action" undoubtedly "use[s]" state land within the meaning of HRS § 343-5(a)(1).

### c. On remand, the circuit court should determine whether the A&B Defendants' "action" is exempt from HEPA's EA requirement.

Having determined that the A&B Defendants' permitted activity is HEPA "action" that constitutes a "use of state . . . lands," we lastly consider whether such activity is exempt from HEPA's environmental-review process under HRS § 343-6(a)(2). Umberger, 140 Hawai'i at 512, 403 P.3d at 289.  HRS § 343-6(a)(2) authorizes the environmental council[40] to adopt rules that "[e]stablish procedures whereby specific types of actions, because they will probably have minimal or no significant effects on the environment, are declared exempt from the preparation of an [EA.]"  Pursuant to HRS § 343-6(a)(2), the environmental council issued Hawai'i Administrative Rules ("HAR") § 11-200-8, which provides that the relevant agency may exempt certain "classes of actions" from environmental review under HEPA so long as the agency "obtain[ed] the advice of other outside agencies or individuals having jurisdiction or expertise

---

[40]    HRS § 343-6(a) refers to "the council," which means "the environmental council."  HRS § 343-2.  The environmental council was created by HRS § 341-3(c) (2010).

as to the propriety of the exemption."  HAR § 11-200-8(a)

(repealed 2019).[41]  For example, under HAR § 11-200-8, "action"

involving the "[o]peration[], repair[], or maintenance of

existing structures, facilities, equipment, or topographical

features, involving negligible or no expansion or change of use

beyond that previously existing" may be exempt from HEPA's EA

requirement.  HAR § 11-200-8(a)(1).  However, HAR § 11-200-8

also provides that "[a]ll exemptions under the classes in this

section are inapplicable when the cumulative impact of planned

successive actions in the same place, over time, is significant,

or when an action that is normally insignificant in its impact

---

[41]     HAR § 11-200 was repealed and replaced by HAR § 11-200.1 on
August 9, 2019.  HAR § 11-200.1-32, titled "Retroactivity," provides that
"[c]hapter 11-200 shall continue to apply to environmental review of agency
and applicant actions which began prior to the adoption of chapter 11-200.1."
Therefore, as the present case concerns HEPA "action" that occurred pre-2019,
the provisions of HAR § 11-200 apply.

>  HAR § 11-200-8(a) provides in relevant part:
>
>  (a)  Chapter 343, HRS, states that a list of classes of
>  actions shall be drawn up which, because they will probably
>  have minimal or no significant effect on the environment,
>  may be declared exempt by the proposing agency or approving
>  agency from the preparation of an environmental assessment
>  provided that agencies declaring an action exempt under
>  this section shall obtain the advice of other outside
>  agencies or individuals having jurisdiction or expertise as
>  to the propriety of the exemption.  Actions declared exempt
>  from the preparation of an environmental assessment under
>  this section are not exempt from complying with any other
>  applicable statute or rule.  The following list represents
>  exempt classes of action:
>
>  (1)  Operations, repairs, or maintenance of existing
>  structures, facilities, equipment, or topographical
>  features, involving negligible or no expansion or change of
>  use beyond that previously existing[.]

on the environment may be significant in a particularly sensitive environment."  HAR § 11-200-8(b).

Because analysis under HAR § 11-200-8 turns heavily on the nature and impact of the A&B Defendants' specific "action," we find that this inquiry properly lies within the circuit court's purview.  On remand, the circuit court should determine (1) whether the A&B Defendants' "action" falls into one of the exempt classes enumerated by HAR § 11-200-8(a) and, if so, (2) whether HAR § 11-200-8(b) renders the exemption inapplicable. If the circuit court finds that either HAR § 11-200-8(a) does not apply or an exemption is inapplicable under HAR § 11-200-8(b), the circuit court should determine how best to apply HEPA's EA requirement to the revocable permits, taking into consideration relevant actions already taken by Defendants toward issuance of the long-term lease, including A&B's publication of a DEIS.

Although the court is aware that the permits in this case were continued along with hundreds of other permits, we do not opine on the validity of other permits not before the court. Given the duration, magnitude, and nature of the uses authorized by the revocable permits here, they may be distinguishable from other, smaller-scale uses similarly authorized by the BLNR.

52

## IV. CONCLUSION

For the foregoing reasons, the ICA's July 31, 2019 judgment on appeal pursuant to its June 18, 2019 memorandum opinion is vacated and the circuit court's October 21, 2015 order granting Petitioners' MPSJ is affirmed in part as to its holding that the revocable permits were not authorized under HRS § 171-55. The circuit court's October 21, 2015 order is vacated in part as to its holding that there is no "action" within the meaning of HRS § 343-5(a) and that HEPA's environmental review process is, thus, inapplicable. The case is remanded to the circuit court for further proceedings consistent with this opinion. On remand, the circuit court should continue to exercise its equitable power as it pertains to the municipal- and residential-water needs of the upcountry Maui community.

David Kauila Kopper
for petitioners Healoha
Carmichael, Lezley Jacintho,
and Nā Moku Aupuni O Ko'olau Hui

Linda L.W. Chow (William J.
Wynhoff on the briefs) for
respondents BLNR, Suzanne Case
in her official capacity as
Chairman of BLNR, and DLNR

David Schulmeister (Trisha
H.S.T. Akagi on the briefs) for
respondents Alexander & Baldwin, Inc.
and East Maui Irrigation Co., Ltd.

Caleb P. Rowe (Kristin K. Tarnstrom
on the briefs) for respondent
County of Maui, Department of
Water Supply

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

